William S. STEELE, Plaintiff–Appellant.

v.

**Doctor SHAH, Mental Health Department, Orange County Jail, Defendant–Appellee.**

No. 93–3396.

United States Court of Appeals, Eleventh Circuit.

July 17, 1996.

As Amended Sept. 6, 1996.

Kevin C. Kaplan, Miami, FL, for appellant.

Howard R. Marsee, Kevin J. Carden, J. Charles Ingram, Hannah, Marsee, Beik & Voght, Orlando, FL, for appellee.

Before TJOFLAT, Chief Judge, RONEY and PHILLIPS *, Senior Circuit Judges.

PHILLIPS, Senior Circuit Judge:

William Steele appeals the district court's grant of summary judgment to the defendant, Dr. Mahendra Shah, in Steele's action brought under 42 U.S.C. § 1983. A prisoner in the Florida state system, Steele alleged that Shah's discontinuation of prescribed psychotropic medication constituted deliberate indifference to his serious medical needs and so violated his constitutional right to be free from cruel and unusual punishment. The district court held that the summary judgment record revealed nothing more than a difference of medical opinion between doctor and patient and that the doctor was, therefore, entitled to summary judgment on the claim of deliberate indifference. Reviewing the judgment de novo, we conclude to the contrary that genuine issues of material fact preclude entry of summary judgment for Shah and we therefore reverse the judgment and remand for further proceedings.

I.

Assessing the summary judgment record in the light most favorable to Steele, as non-movant, the facts are as follows. In September, 1991, Steele had just been incarcerated in Florida's Polk Correctional Institution. At that time, prison officials became aware he had a long history of drug addiction and other substance abuse and had attempted suicide at least twice in 1988. In addition to his recent incarceration to serve at least twenty-five years in prison, he then faced a divorce at the instance of his wife of fourteen years. According to Irma McConnell, a Psychological Specialist at Polk, Steele was more than ordinarily upset by his situation, especially the loss of his wife and three children, and in the psychologist's opinion was, in psychological parlance, highly "labile," i.e., unable to control his emotions and subject to severe mood swings. Although while at Polk he remained within normal psychological limits in the sense that he reported no immedi-

ate suicidal or homicidal tendencies, his emotional condition was severe enough that McConnell and the prison's psychiatrist, a Dr. Carra, considered Steele a potential suicide risk. He was diagnosed as having "Adjustment Disorder with Anxious Mood" and was prescribed psychotropic drugs, Prozac and Tofranil, to control his condition. He was also given Benadryl to treat rashes and other drugs to treat a chronic stomach disorder.

Until November 21, 1991, when he was transferred from Polk, Steele saw McConnell for counseling on a regular basis and saw Dr. Carra occasionally. Although he was slowly improving, according to McConnell he remained in need of the psychotropic drugs. Moreover, his anxieties began to increase with the approach of his transfer to another prison facility to await trial on another criminal charge.

Steele reached the new facility, the Orange County jail, accompanied by no medical records but only his "Treatment Plan," which apparently outlined the course of drugs prescribed by the doctors at Polk but contained little other information. So far as appears on the record, his initial screening on his arrival at this facility consisted of nothing but the notation of the details of his treatment plan in his new Orange County chart and a notation that he should be referred to this facility's psychiatrist, Dr. Mahendra Shah, for evaluation of his medications and his condition. Five days later, on November 26, 1991, Steele, according to his account, was called out of his cell and into a glass-walled conference room, into which most of the prisoners could see from their cells. In that room, Dr. Shah announced to Steele that all of his medications, perhaps excepting Benadryl, would be discontinued. Steele protested and tried to ask Shah to explain the reasons for his actions, but Shah refused to discuss the matter and simply told Steele that he was "dismissed." The entire meeting lasted less than one minute and included nothing that could be construed as an evaluation of Steele's mental condition or need for psychotropic drugs.

After the loss of the drugs, Steele suffered from insomnia, anxiety, and various bodily

* Honorable J. Dickson Phillips, Jr., Senior U.S. Circuit Judge for the Fourth Circuit, sitting by designation.

pains. He filed numerous grievances regarding the discontinuation of his drugs but without success. He also wrote two letters to his former caretakers at Polk in which he expressed his feelings of helplessness and his physical suffering and asked for help. In response, the psychiatric nurse at Polk called the medical staff supervisor at Orange to make clear that Steele was considered a potential suicide risk. McConnell and Carra followed up with a letter to Orange that again clarified Steele's diagnosis and noted that he "was aggressively being treated with Prozac ... and Tofranil...." It made clear that Steele had been dependent on cocaine, had a history of suicide attempts, and was now considered a "potential suicide risk." The letter also mentioned that Steele had written Polk twice and expressed "feelings of hopelessness and helplessness." In these letters, Steele had further expressed concerns specifically regarding the discontinuation of his psychotropic drugs.

Back at Orange, Shah scheduled at least three follow-up meetings with Steele. Each time, however, Shah began the meeting by trying to tape record the session and by claiming that he had "prior assessed" Steele (by which we assume he intended to convey that he had made an informed assessment of Steele's condition before the November 26 interview). Shah has presented no forecast of evidence, however, that directly refutes Steele's factual assertion that Shah had not had access to any of Steele's medical records at that point. At each of these meetings, Steele refused to be recorded, purportedly for fear of a loss of confidentiality, called Shah a liar for claiming that he had assessed him before their first meeting, and stormed out of the room.

Steele continued without his psychotropic drugs throughout his 182 days at Orange but was put back on them as soon as he returned to Polk in May of 1992.

Shah, as movant, relied on summary judgment materials which gave an account critically at odds with Steele's. First, he relied upon a "Confidential Psychiatric Evaluation," dated November 26, 1991, and prepared by himself, which gave an account of an amicable interview on that date with Steele.[1] According to this "Evaluation,"

Steele was cooperative and answered a number of questions, demonstrating no symptoms that would require psychotropic drugs or any treatment beyond "supportive therapy." This account thus directly contradicted that of Steele both as to the tone, the content and the duration of this initial encounter. Second, Shah relied upon an affidavit of a Dr. R.E. Ballentine in which Ballentine declared himself "familiar with the applicable standard of care for rendering psychiatric care to patients in correctional institutions" like Orange, asserted that he had reviewed Steele's medical records from Polk and Orange, and gave as his "opinion that the medical and psychiatric care rendered to William Stewart Steele by Dr. Mahendra Shah ... did not constitute negligence, and was within the accepted standard of care."

In January, 1992, before his return to Polk, Steele filed this § 1983 action against Shah, claiming that Shah exhibited deliberate indifference to his serious medical needs in peremptorily discontinuing Steele's medication without actually examining Steele or reviewing his medical records or consulting with the medical staff at Polk. Steele proceeded pro se throughout the district court proceedings, although he requested and was denied appointment of counsel. After fifteen months of confused discovery in which Steele failed to obtain all the material he sought—such as deposition transcripts and some of his Polk medical records—Shah moved for summary judgment. Steele requested and received an extension of time to respond to the motion, at least in part so that he could receive copies of the deposition transcripts. But, in the end, Steele responded to the motion with no more material at hand than he had had when the motion was first filed.

About six weeks after the deadline for response but some months before the district court ultimately ruled on the summary judgment motion, Steele filed a motion for appointment of an expert witness and particularly requested that Dr. Carra be the appointed expert. That motion was denied.

The district judge then granted summary judgment in Shah's favor. Referring only to

---

**1.** This Report actually was appended to Steele's complaint, but Shah was of course entitled to

rely upon it as material on file. *See* Fed.R.Civ.P. 56(c).

Shah's Psychiatric Evaluation report, to the fact that Shah discontinued no prescribed medication other than the psychotropic drugs, and to Steele's termination of Shah's scheduled follow-up interviews, the court concluded that "at best, Plaintiff has demonstrated a difference in medical opinion between Defendant and himself as to the latter's diagnosis or course of treatment, which does not support a claim of cruel and unusual punishment. The complaint and the medical records flatly refute any suggestion that Defendant ignored or abused Plaintiff or manifested deliberate indifference toward him." The court held that "Defendant exercised his professional judgment and made the decision to discontinue Plaintiff's prescription for certain medications. Plaintiff's disagreement with Defendant as to the manner of his medical care does not constitute deliberate indifference to his serious medical needs." On this stated basis, the court then granted summary judgment in Shah's favor.

This appeal followed.

## II.

■ The district court was, of course, obligated to evaluate the summary judgment record in the light most favorable to Steele as the nonmovant and to grant Shah's motion only if that record demonstrated that there was no genuine issue of material fact and that Shah was entitled to judgment as a matter of law. *Sheckells v. AGV–USA Corp.*, 987 F.2d 1532, 1534 (11th Cir.1993); F.R.C.P. 56. We review a district court's grant of summary judgment de novo. *Twiss v. Kury*, 25 F.3d 1551, 1554 (11th Cir.1994). We therefore ask whether, viewing the record as it existed before the district court in the light most favorable to Steele, a genuine issue of material fact existed as to whether Shah's actions constituted deliberate indifference to Steele's serious medical needs. See *Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). And since a finding of deliberate indifference requires a

finding of the defendant's subjective awareness of the relevant risk, *Farmer v. Brennan*, 511 U.S. 825, ——, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994), a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, *Farmer*, 511 U.S. at ——, 114 S.Ct. at 1981, of such subjective awareness. See *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir.1996) (acknowledging *Farmer*'s requirement of subjective awareness and rejection of a solely objective test of deliberate indifference).

■ In this circuit, it is established that psychiatric needs can constitute serious medical needs and that the quality of psychiatric care one receives can be so substantial a deviation from accepted standards as to evidence deliberate indifference to those serious psychiatric needs. *See Greason v. Kemp*, 891 F.2d 829 (11th Cir.1990). In *Greason*, reviewing the denial of summary judgment on qualified immunity grounds, we held that there exists a "clearly established right to have [one's] psychotropic medication continued if discontinuation would amount to grossly inadequate psychiatric care." *Id.* at 834 n. 10. In that case, the evidence as forecast in the summary judgment record would have supported a jury finding that a prison psychiatrist had abruptly discontinued a prisoner's psychotropic drugs on the basis of a visit of a "few minutes" and without reviewing the prisoner's medical file or doing a "mental status examination" and that had he reviewed the file, he would have seen that the prisoner was a serious suicide risk. We concluded that on those facts, a jury would have been entitled to find that the private doctor afforded the prisoner grossly inadequate care and "that he realized he was doing so at the time" thus exhibiting deliberate indifference to the prisoner's needs. *Greason*, 891 F.2d at 835. See also *Waldrop v. Evans*, 871 F.2d 1030, 1034–35 (11th Cir.1989)[2] (holding,

---

2. *Greason* and *Waldrop*, our most directly relevant precedents on deliberate indifference in the specific factual context of this case, both were decided before *Farmer* expressly held, clarifying the matter, that deliberate indifference requires subjective awareness, not merely objective awareness, by the state-actor-defendant of the risk posed by a serious medical condition. Like others of our pre-*Farmer* deliberate-indifference decisions, they contained language suggesting that mere objective awareness (should have

known) as well as subjective (actual) awareness might suffice. To the extent they did suggest that, *Farmer* rejected that understanding, as this court since has specifically recognized in, e.g., *Cottrell*. But all of our pre-*Farmer* decisions, including *Greason* and *Waldrop*, necessarily also recognized and applied the rule that where proof of subjective awareness was presented, it of course sufficed. Indeed, both *Greason* (surely) and *Waldrop* (almost as surely) based their spe-

where a prisoner was deprived of lithium, that summary judgment was precluded by a genuine dispute between experts on the question whether the doctor's acts constituted legitimate medical practice or either gross incompetence or the deliberate choice of an easier but less effective course of treatment).[3]

■ We think this case is not materially distinguishable from *Greason* on the question whether the conduct charged, if found in Steele's favor, would support a finding of deliberate indifference violative of constitutional rights. A jury accepting Steele's account of his encounters with Shah and of Shah's conduct would be entitled to find that Shah discontinued Steele's medication on the basis of one cursory interview and without having reviewed any medical records beyond the Treatment Plan sent over from the Polk facility. It could thus "conclude that [Shah] knew of a substantial risk from the very fact that the risk was obvious" and that Shah deliberately disregarded that risk. It could further find that in ample time to make a different medical judgment or at least to reconsider that made, Shah was aware from Polk personnel that Steele was considered by them to be a potential suicide risk, and that that was one basis for their prescription of the psychotropic drugs. We do not hold that such findings would compel an ultimate finding of deliberate indifference under *Greason* and *Farmer*, only that they would support such a finding. That suffices to demonstrate that on the summary judgment record there were genuine issues of material fact.

Of course, the actual facts of the matter may be significantly different from Steele's account and more in keeping with Shah's. Shah, however, has chosen at this point to provide only meager evidentiary support for his version of the relevant facts. He relies essentially only on his own "Psychiatric Evaluation" report of the critical November 26 interview, the opinion of Dr. Ballentine, and

Steele's concession of his refusal to submit to Shah's scheduled follow-up interviews. But nothing in the "Psychiatric Evaluation," the Ballentine affidavit, or Steele's concession as to later events does more than contradict by implication some aspects of Steele's account of the limited duration and abrupt termination of the November 26 interview and that it was conducted without benefit of any prior or contemporaneous consideration of Steele's medical records. Perhaps the actual facts are that the interview was a much more extended one, and the decision to cut off the psychotropic medication adequately based upon sufficient information obtained in the interview, or from other sources, or both. But those facts surely do not go undisputed on the record before us. If they did, they would of course substantiate the medical opinion of Dr. Ballentine, but, as that opinion stands on the record, it is a conclusory one that does not assert any knowledge of the facts of the November 26 interview, hence cannot serve even to dispute Steele's version of that potentially critical event.

We, of course, must take the summary judgment record as the parties have chosen to make it. Doing that here, we conclude that under the relevant constitutional principles, there are genuine issues of material fact respecting the circumstances under which Shah discontinued Steele's medication that make summary judgment inappropriate at this point.

### III.

Steele also challenges the district court's refusal to appoint counsel and an expert witness to assist him. The district court gave no explanation for the refusal to appoint either. Both motions raised issues requiring the exercise of informed discretion; neither warranted rejection out of hand as a matter of law. Under these circumstances we are unable to review these denials for abuse of discretion. Upon the remand to be ordered, the district court should reconsider them,

---

cific holdings on the existence of evidence of subjective awareness. *See Greason*, 891 F.2d at 835 (evidence sufficient to support a finding that defendant "realized" the risk being taken); *Waldrop*, 871 F.2d at 1035 (evidence sufficient to support a finding of "choice" of an easier but less effective treatment of a known condition). Their specific holdings have not, therefore, been affected by *Farmer*'s rejection of an objective-awareness test for deliberate indifference.

3. The consequences of the discontinuances of comparable medications in *Greason* and *Waldrop* were much more profound than any alleged by Steele in this case: suicide in *Greason*, self-mutilation in *Waldrop*. That, however, goes only to the issue of damages and is essentially irrelevant to the liability issue.

exercising its discretion in accordance with what follows.

### A.

■ Rule 706, Fed.R.Evid. provides the court with discretionary power to appoint an expert witness either on the court's own motion or the motion of a party. Steele invoked an exercise of that discretion and was entitled to a reasoned ruling upon it. The case is one that by its nature warrants consideration of the possible need in order to insure a just resolution of the claim. As the parties agree, the appropriate standard of psychiatric care is at issue in the case. Expert opinion on that issue and its application here obviously might be important to the finder of fact. *See Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986). If, as he claims, Steele is indigent, this could provide further reason to appoint an expert to avoid a wholly one-sided presentation of opinions on the issue. *See* Michael H. Graham, *Federal Practice and Procedure* § 6681, at 355 (interim ed. 1992) (noting that one of the rationales for Rule 706 is that some litigants may not have the wherewithal to locate and/or pay for an expert). See also *Smith v. Jenkins*, 919 F.2d 90, 93–94 (8th Cir.1990) (noting in another case of claimed deliberate indifference by a prison doctor the necessity of expert witnesses and the advisability of the court's appointing an expert on remand).

We emphasize that we do not here offer any opinion on the propriety of appointing an expert witness; we only direct that discretion on the matter be exercised and reflected in a reasoned ruling.

### B.

■ Court appointed counsel in civil cases is warranted only in "exceptional circumstances," and whether such circumstances exist is also committed to district court discretion. *See Kilgo v. Ricks*, 983 F.2d 189, 193 (11th Cir.1993) ("key is whether the *pro se* litigant needs help in presenting the essential merits of his or her position to the court"); *Ulmer v. Chancellor*, 691 F.2d 209, 213 (5th Cir.1982) (outlining factors relevant to determination of need). Here the magistrate judge who denied Steele's motion for appointment of counsel was correct that he had no right to appointed counsel in the absence of exceptional circumstances, see *Poole v. Lambert*, 819 F.2d 1025, 1028 (11th Cir.1987), but he did not adequately explain his bare assertion that the necessary circumstances were absent from this case. Again, we cannot for that reason fairly review the ruling appealed.

With it now determined that genuine issues of material fact remain to be resolved and that the resolution of those issues will turn in large part on a contest of credibility between Shah and Steele and on expert opinion, a reasoned reconsideration of Steele's motion for the aid of appointed counsel should be made upon remand. Again, we do not by this express any opinion on the merits of that matter, only that it warrants an exercise of informed discretion and a ruling on whether exceptional circumstances for the appointment do exist.

### IV.

Because summary judgment for Shah was not warranted on the record before the district court, we reverse the judgment and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.